IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PENNY L. TUTER,

        Plaintiff,                    No. 2:11-CV-01474-KJN (TEMP)

      v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.             ORDER
_____/

       Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act ("Act")[1]  In her motion for summary judgment, plaintiff principally contends that the Commissioner erred by finding that plaintiff was not disabled from November 27, 2007, through the date of the final administrative decision. (Dkt. No. 17.)  The Commissioner filed an opposition to plaintiff's motion and a cross-motion for summary judgment. (Dkt. No. 20.) Plaintiff filed a reply brief. (Dkt. No. 21.)  For the reasons that follow, the court grants plaintiff's

---

[1] This case was referred to the undersigned pursuant to Eastern District of California Local Rule 302(c)(15) and 28 U.S.C. § 636(c), and both parties voluntarily consented to proceed before a United States Magistrate Judge. (Dkt. Nos. 7, 10.)

motion for summary judgment in part, denies the Commissioner's cross-motion for summary judgment, and remands the case for further proceedings under sentence four of 42 U.S.C. § 405(g).

I.   BACKGROUND

Plaintiff was born on September 23, 1961, has a high school education, and previously worked primarily as a housekeeper and a food demonstrator.[2]  (Administrative Transcript ("AT") 141, 213, 216.)  On February 26, 2008, plaintiff applied for DIB and SSI, alleging that she was unable to work as of November 27, 2007, due to left hip problems, back pain, left knee pain, and left leg pain and numbness.  (AT 141-54, 204, 208, 228, 230, 253, 255, 256, 451.)  On April 11, 2008, the Commissioner determined that plaintiff was not disabled.  (AT 66-67, 70-72.)  Upon plaintiff's request for reconsideration filed April 21, 2008, the determination was affirmed on May 19, 2008.  (AT 68-69, 73-76.)  Subsequently, plaintiff requested a hearing before an administrative law judge ("ALJ"), which took place on March 18, 2010.  (AT 34, 81-85.)

In a decision dated May 24, 2010, the ALJ determined that plaintiff has not been under a disability, as defined in the Act, from November 27, 2007, through the date of that decision.  (AT 20-28.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on April 6, 2011.  (AT 1-6, 12-16.)  In the course of its review, the Appeals Council received additional evidence, which was made part of the record.  (AT 5.)  Plaintiff subsequently filed this action in federal district court on May 31, 2011.  (Dkt. No. 1.)

////

////

---

[2] Because the parties are familiar with the factual background of this case, including plaintiff's medical history, the court does not exhaustively relate those facts herein.  The facts related to plaintiff's impairments and medical history will be addressed insofar as they are relevant to the issues presented by the parties' respective motions.

## II. ISSUES PRESENTED

Plaintiff has raised the following issues: (1) whether the ALJ improperly rejected the opinions of plaintiff's treating physicians; (2) whether the ALJ's assessment of plaintiff's residual functional capacity ("RFC") and resulting hypothetical question to the vocational expert ("VE") were not supported by substantial evidence; and (3) whether the ALJ improperly discredited plaintiff's testimony and third-party written statements. (Pl.'s Mot. 17.)

## III. LEGAL STANDARD

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

## IV. DISCUSSION

### A. Summary of the ALJ's Findings

The ALJ evaluated plaintiff's entitlement to DIB and SSI pursuant to the Commissioner's standard five-step analytical framework.[3] As an initial matter, the ALJ noted

---

[3] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program. 42 U.S.C. §§ 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. §§ 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).

1  that plaintiff meets the insured status requirements of the Act through December 31, 2013. (AT

2  22.) At the first step, the ALJ concluded that plaintiff had not engaged in substantial gainful

3  activity as of November 27, 2007, the alleged onset date. (AT 22.) At step two, he found

4  plaintiff's degenerative joint disease of the hips to be a severe impairment. (AT 22.) However,

5  at step three, the ALJ determined that plaintiff's impairments did not meet or medically equal an

6  impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AT 23.)

7  Before proceeding to step four, the ALJ assessed plaintiff's RFC and found that

8  she could "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for

9  occasional climbing of stairs and ramps, balancing, stooping, kneeling, crouching, and crawling;

10 stand and walk 2 hours out of 8; sit 6 hours out of 8; no climbing of ladders, ropes or scaffolds,

11 and no work at unprotected heights or working around dangerous moving machinery." (AT 23.)

12 He further found that plaintiff must "avoid concentrated exposure to extremes of cold and

---

A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

hazards." (AT 23.)

At step four, the ALJ concluded that plaintiff was unable to perform any of her past relevant work. (AT 26.) Finally, at step five, the ALJ noted that plaintiff was 46 years old on the alleged disability onset date, had at least a high school education, and was able to communicate in English. (AT 27.) He further concluded that transferability of job skills was not an issue, because plaintiff's past relevant work was unskilled. (AT 27.) The ALJ found that, upon consideration of plaintiff's age, education, work experience, and residual functional capacity, "there are jobs that exist in significant numbers in the national economy" that plaintiff could perform. (AT 27.) The ALJ relied on the testimony of a VE, who testified that an individual with plaintiff's RFC could perform the following sedentary, unskilled representative occupations: (1) surveillance system monitor, with 210 jobs in the state and 47,000 jobs in the nation; (2) order clerk, with 670 jobs in the state and 160,000 jobs in the nation; (3) sorter, with 170 jobs in the state and 10,000 jobs in the nation; (4) charge account clerk, with 360 jobs in the state and 97,000 jobs in the nation; and (5) patcher, with 1,120 jobs in the state and 195,000 jobs in the nation. (AT 27.)

Accordingly, the ALJ concluded that plaintiff had not been under a disability, as defined in the Act, from November 27, 2007, through the date of the ALJ's decision. (AT 28.)

    B.    <u>Plaintiff's Substantive Challenges to the Commissioner's Determinations</u>

        1.    <u>Whether the Commissioner Improperly Rejected the Opinions of Plaintiff's Treating Physicians</u>

Plaintiff asserts that the ALJ and the Appeals Council failed to provide specific and legitimate reasons for rejecting the opinions of her treating family physician, Dr. Sam Williams, and her treating orthopaedic surgeon, Dr. Keith Ure.

The medical opinions of three types of medical sources are recognized in social security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the

5

claimant (nonexamining physicians)." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion. Id.  Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the physician's ultimate conclusions. Id.  If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. Id. at 830-31; accord Valentine v. Comm'r, 574 F.3d 685, 692 (9th Cir. 2009).  "'The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [his] interpretation thereof, and making findings.'" Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (quoting Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  "The ALJ is responsible for determining credibility and resolving conflicts in medical testimony." Magallanes, 881 F.2d at 750; see also Burkhart v. Bowen, 856 F.2d 1335, 1339-40 (9th Cir. 1988) (affirming where the ALJ carefully detailed arguably conflicting clinical evidence and provided reasons for crediting one treating physician's opinion over another treating physician's opinion).

      Before turning to plaintiff's specific contentions, a summary of the medical evidence in this case is appropriate.  The record reveals that plaintiff complained of hip pain radiating into her thighs as early as 1999, and it contains numerous reports of plaintiff complaining of pain in her lower back, left hip, knee, and ankle between 2005 and 2007.  (AT 317-21, 366-67, 369, 373.)  X-rays showed degeneration of the left hip socket assembly, L4

////

////

////

spondylolisthesis,[4] and numerous decreases in disc height in her lumbar spine with anterior spondylosis[5] of the low thoracic area. (AT 317.) In the course of treatment for gynecological problems in the latter half of 2007, plaintiff complained several times of low back pain, left hip pain, sciatica, and left knee pain. (AT 266-70, 292-95.) On September 21, 2007, plaintiff indicated that her symptoms were worsening. (AT 266.) Also, on October 22, 2007, just prior to a hysterectomy, plaintiff's symptoms were listed as low back pain, left leg radiating pain, left calf numbness, left hip pain, and left knee pain. (AT 292.) On January 14, 2007, a Doppler study ruled out deep venous thrombosis in plaintiff's left leg. (AT 269-70, 308.)

Subsequently, on February 26, 2008, Dr. Michael Righetti, an orthopedic surgeon, examined plaintiff. (AT 314.) Dr. Righetti found that plaintiff's left leg was very tender in the groin and buttock area and that she had absolutely no rotation of her left hip with flexion. (AT 314.) Plaintiff's hip x-rays showed severe degenerative arthritis of the left hip, while the x-rays of her left knee showed two small benign bone tumors. (AT 314.) Dr. Righetti opined that plaintiff was unable to work even a sedentary job at that time and noted that plaintiff was trying to find a way to get her hip replaced. (AT 314, 365.)

On April 9, 2008, state agency physician Dr. Robert Mitgang reviewed plaintiff's medical records and completed a physical RFC assessment form. (AT 322-30.) He opined that plaintiff was limited to lifting/carrying/pushing/pulling 20 pounds occasionally and 10 pounds frequently, standing and/or walking with normal breaks for at least 2 hours in an 8-hour workday, and sitting with normal breaks for about 6 hours in an 8-hour workday. (AT 323.) Dr. Mitgang further indicated that plaintiff should never climb ladders, ropes, or scaffolds, but could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. (AT 324.) He also

---

[4] Spondylolisthesis is a condition in which a bone (vertebra) in the lower part of the spine slips out of the proper position onto the bone below it. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002240/.

[5] Spondylosis refers to degeneration of the spine. See http://www.spine-health.com/conditions/back-pain/spondylosis-what-it-actually-means.

noted that plaintiff should avoid concentrated exposure to extreme cold and hazards such as machinery and heights, but imposed no other environmental limitations and no manipulative, visual, or communicative limitations. (AT 325-26.)  Finally, Dr. Mitgang stated that the severity of plaintiff's symptoms and their effect on function are consistent with the medical and non-medical evidence, but that plaintiff should be able to perform work within the limits of the assessed RFC.  (AT 327.)  On May 13, 2008, another state agency physician, Dr. David Jordan, also reviewed plaintiff's medical records and affirmed Dr. Mitgang's assessment.  (AT 331.)

Thereafter, on July 7, 2008, further x-rays of plaintiff's left hip and knee were taken.  (AT 332-33.)  The left hip x-rays showed severe left hip degenerative change with possible avascular necrosis.[6]  (AT 332.)  The left knee x-rays showed a small tug lesion.  (AT 333.)  A July 21, 2008 MRI of the left hip revealed asymmetry of the acetabula, loss of joint space in the left hip, and other degenerative abnormalities.  (AT 377.)

After moving from Montana to California, plaintiff received treatment at Alpine Healthcare and Mercy Medical Center for hip and back pain between September 2008, and June 2010.  At plaintiff's first visit on September 22, 2008, physician's assistant ("PA") Cathy Metro documented that plaintiff's left hip had significantly decreased external rotation and that her left hip pain had worsened over time.  (AT 436.)  On October 2, 2008, PA Rob Williams diagnosed plaintiff with end stage osteoarthritis versus avascular necrosis in her left hip, as well as spondylolisthesis in her lower back, and referred her for a surgical consultation with Dr. Ure.  (AT 435.)  He observed that she needed a cane to walk.  (AT 435.)  An x-ray of plaintiff's left hip taken the next day showed severe left hip osteoarthritis.  (AT 358.)  An x-ray of plaintiff's

////

////

---

[6] Avascular necrosis is the death of bone tissue due to a lack of blood supply, which can lead to breaks in the bone and the bone's eventual collapse.  See http://www.mayoclinic.com/health/avascular-necrosis/DS00650.

lumbar spine taken that same day indicated degenerative disk disease and facet arthropathy[7] with degenerative spondylolisthesis at L4-5 and facet arthropathy at L5-S1.  (AT 359.)

Also on October 2, 2008, Dr. Ure completed a disability form stating that plaintiff had a chronic condition, was actively seeking treatment, was unable to work, could never lift even 10 pounds, and could never climb, balance, stoop, kneel, crouch, crawl, or reach.  (AT 471-72.)  He also indicated that plaintiff would require a total hip replacement.  (AT 472.)

Subsequently, on November 19, 2008, Dr. Ure performed a total left hip replacement on plaintiff.  (AT 335-36.)  The pathology report following the surgery confirmed that plaintiff had severe osteoarthritis in the left hip, but there was no gross evidence of necrosis.  (AT 337.)  On December 4, 2008, approximately two weeks after surgery, plaintiff reported slowly decreasing left hip pain to Dr. Ure.  (AT 433.)  On January 8, 2009, about six weeks after surgery, plaintiff informed Dr. Ure that she had minimal pain, and he recommended follow-up in six months.  (AT 432.)  From December 16, 2008, to April 21, 2009, plaintiff received post-operative physical therapy.  (AT 348-49, 405-24.)

On February 18, 2009, an MRI of plaintiff's lumbar spine showed diffuse facet arthritis throughout the lumbar spine with findings most severe at L4-5, where there were facet arthritis, a small disk bulge, and moderate central and mild bilateral foraminal stenosis.  (AT 350, 438-39.)  On March 17, 2009, Dr. Ure classified plaintiff as temporarily disabled and indicated that she could likely return to work on August 15, 2009.  (AT 470.)  According to an April 28, 2009 treatment record, plaintiff complained of pain throughout her spine.  (AT 431.)  Thereafter, on August 11, 2009, PA Rob Williams noted that plaintiff was "doing well in regards to her total hip replacement."  (AT 445.)  He stated that she continues to experience a "moderate degree of high buttock and deep gluteal pain," and that she does have a "long standing history of chronic low back pain with diagnosis of spondylolisthesis."  (AT 445.)  Observing that she would always

---

[7] Facet arthropathy is degenerative arthritis of the facet joints in the posterior of the spine. See http://www.advancedorthopain.com/pain-disorders/facet-arthropathy.html.

9

have some component of structural low back pain, he indicated that facet versus foraminal injections may be an option if the pain becomes progressive, but recommended that she pursue physical therapy first. (AT 445.)

Subsequently, on August 14, 2009, plaintiff was examined by Dr. Sam Williams, her family physician. (AT 382.) He stated that plaintiff was experiencing continuous hip pain with some postural exacerbations, although her evaluation suggested that the discomfort was not coming from her hip, which remained well-maintained after her surgery, but possibly from her back. (AT 382.) However, she did not report any particular back discomforts at that time. (AT 382.) Dr. Williams further stated that plaintiff had been "relatively and intermittently poorly compliant with restrictions advised by her surgeon for joint maintenance with some extremes of posturing." (AT 382.) He indicated that this non-compliance may cause some of her discomforts and recommended adaptive physical education. (AT 382.)

On September 29, 2009, P.A. Rob Williams confirmed that plaintiff's hip was doing well, but that she continues to have deep left gluteal pain with radiation into the posterior thigh, calf, and foot, accentuated with prolonged standing and walking. (AT 429.) He again noted her history of spondylolisthesis at L4-5 and confirmed foraminal and central stenosis at that level. (AT 429.) He recommended a selective nerve root block epidural injection at L4-5, which was subsequently administered by Dr. Guthrie, plaintiff's pain management physician, on December 16, 2009. (AT 379, 429.)

Following the injection, on January 7, 2010, plaintiff informed Dr. Ure that the injection had "helped considerably," and she reported no hip pain and only mild discomfort when she crossed her legs. (AT 428.) On February 22, 2010, plaintiff confirmed to PA Rob Williams that the injection resulted in a "significant reduction in her radicular leg pain." (AT 427.) However, while she denied symptoms when inactive, she reported that her symptoms increased to 7/10 when she was up walking or active with housework. (AT 427.) Mr. Williams recommended that plaintiff continue with adaptive physical therapy. (AT 427.)

Subsequently, on March 15, 2010, Dr. Sam Williams, plaintiff's family physician, completed an assessment of plaintiff's functional limitations. (AT 443.) He indicated that he treated plaintiff for one year and that she had degenerative joint disease with hip pain and low back pain. (AT 443.) He opined that plaintiff could only walk half a block on a flat surface before resting; stand for 1 hour at a time; stand and walk for a total of 4 hours in an 8-hour day; sit continuously for 1.5 hours and for 6.5 hours total in an 8-hour day; and would need to elevate her feet from time to time during the day. (AT 443.) He also stated that plaintiff could frequently lift up to 10 pounds and is limited in gross manipulation. (AT 443.) Dr. Williams further opined that, during an 8-hour shift, plaintiff would need to lie down two times for an hour each time, and that she would have a need for unpredictable recumbency. (AT 443.) According to him, if plaintiff worked, she would have increased pain leading to poor concentration and would be at risk for falls. (AT 443.) Dr. Williams stated that plaintiff would not be on task for 20% of the work day, could not be expected to work more than one consecutive day at a time, and would miss an average of 6 or more work days per month due to chronic pain and degenerative joint disease. (AT 443.)

On April 1, 2010, plaintiff reported to Dr. Ure that, although the previous injection helped for about 2 months, she was experiencing increasing low back and bilateral buttock pain. (AT 446.) After finding no problems with plaintiff's hip replacement, Dr. Ure diagnosed plaintiff with lumbar spondylosis and referred her for potential further injections with Dr. Guthrie as well as physical therapy. (AT 446.) On April 27, 2010, plaintiff saw Dr. Guthrie, who noted that plaintiff had only occasional left leg pain, but that her primary problem was back pain in the lumbar spine, which worsened with extension, lateral bending, and activity. (AT 452.) He assessed her condition as lumbar spondylosis with likely facet-mediated pain, spondylolisthesis at L4-5, and improved left L4 radiculopathy. (AT 452.) He recommended that plaintiff pursue physical therapy prior to considering further injections. (AT 452.)

////

Plaintiff again attended physical therapy, and the physical therapist documented symptoms of bilateral sacroiliac joint pain with constant pain (4-6 on a 10-point scale) in plaintiff's left buttock and posterior thigh, as well as intermittent numbness in her left leg. (AT 461-65.) Plaintiff told the physical therapist that she had noted a progressive decrease in overall function during the past several years due to pain. (AT 464.) Finally, on June 22, 2010, Dr. Guthrie again saw plaintiff and noted that plaintiff had pursued physical therapy with no significant change in her back pain and that she experienced continued pain with prolonged driving. (AT 460.) He recommended further injections to decrease the pain. (AT 460.)

At the March 18, 2010 hearing, a medical expert and board-certified family practice physician, Dr. Alice Cox, testified that she basically agreed with state agency physician Dr. Mitgang's April 9, 2008 sedentary RFC assessment. (AT 41.) She further testified that the assessment was valid until six months after plaintiff's hip replacement surgery, i.e. May 19, 2009, at which point plaintiff was able to perform a full range of light work. (AT 41.)

Plaintiff correctly points out that the ALJ failed to provide specific and legitimate reasons for rejecting the opinion of her treating family physician, Dr. Sam Williams. Indeed, as the Commissioner concedes, the ALJ never addressed Dr. Williams's March 15, 2010 assessment and erroneously stated that "there is no contrary assessment by a treating or examining source to preclude the claimant from performing all work related activities." (AT 26.) To the contrary, Dr. Williams's assessment contained various potentially disabling limitations, including that plaintiff would need to lie down two times for an hour each time during an eight-hour shift, would have a need for unpredictable recumbency, would not be on task for 20% of the work day, could not be expected to work more than one consecutive day at a time, and would miss an average of 6 or more work days per month. (AT 443.) The VE testified that many of these limitations would preclude employment in the representative occupations identified by the VE at the hearing. (AT 62-64.)

////

The Commissioner invites the court to reject Dr. Williams's assessment on the basis that it is a conclusory "one-page, pre-printed form consisting of nothing more than check boxes and fill-in-the-blanks," and that it is authored by a non-specialist family physician and relies heavily on plaintiff's subjective complaints. See Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (rejecting treating physician's opinion that was conclusory and unsubstantiated by relevant medical documentation). However, the court must decline that invitation for two primary reasons.

First, the court is generally constrained to review the reasons the ALJ asserts for rejecting an opinion and cannot affirm his decision on a ground the ALJ did not invoke. See Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir. 2006). Because the ALJ entirely failed to discuss Dr. Williams's opinion, there are no reasons from the ALJ to review, and the Commissioner's arguments before the district court are at best post-hoc rationalizations.

Second, the ALJ's failure to address Dr. Williams's opinion was not harmless error. A reviewing court cannot consider such error harmless "unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." Stout, 454 F.3d at 1056 (involving an ALJ's failure to address competent lay testimony favorable to the claimant). The court agrees that Dr. Williams's one-page assessment on March 15, 2010 is somewhat conclusory and that some of the limitations imposed appear extreme in light of some other medical evidence indicating that plaintiff's symptoms improved after her hip replacement surgery. However, Dr. Williams had treated plaintiff for approximately one year, and there are some objective evidence, including x-rays, as well as diagnoses by other medical providers indicating degeneration in plaintiff's lumbar spine. (See e.g. AT 350, 379, 427, 429, 438-39, 445-46, 452.) In fact, it appears that even though plaintiff's hip was doing fairly well after her hip replacement surgery, her back pain subsequently became a more significant issue. Even though some of the treatment records indicate significantly reduced pain during certain periods, it is unclear whether that may have been a

short-term effect of the pain injections administered.

Therefore, Dr. Williams's opinion was not entirely conclusory or unsubstantiated by medical documentation.  Importantly, the court cannot "confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination," Stout, 454 F.3d at 1056, because the VE specifically testified that many of Dr. Williams's functional limitations, if credited, would preclude employment in the representative occupations.  (AT 62-64.)

Moreover, Dr. Williams's March 15, 2010 opinion is the most recent RFC assessment by a treating physician.  The April 2008 and May 2008 RFC assessments by the state agency physicians, Drs. Mitgang and Jordan, predate plaintiff's November 19, 2008 hip replacement surgery, and are therefore not reliable opinions as to plaintiff's post-hip replacement RFC.  In any event, those physicians never examined plaintiff and their opinions in themselves are insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.  Furthermore, the medical expert who testified at the hearing, Dr. Alice Cox, never had an opportunity to review Dr. Williams's opinion or several other treatment records that documented plaintiff's continuing complaints of back pain, physical therapy, and further pain injections.  (AT 443-473.)[8]  For whatever reason, the Commissioner did not obtain a consultative examination of plaintiff to determine her RFC after recovery from the hip replacement surgery.

Accordingly, in light of the ALJ's error, the court must determine whether the case should be remanded for further proceedings or an award of benefits, a decision within the discretion of the court.  Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).  An award of benefits is appropriate where "no useful purpose would be served by further administrative

---

[8] Dr. Cox testified that she had personally reviewed Exhibits 1F-23F, and the ALJ indicated that he had read Exhibit 24F to her verbatim.  (AT 39.)  Exhibits 25F-31F were submitted to the ALJ after the hearing (including Dr. Williams's March 15, 2010 assessment at Exhibit 25F) and Exhibits 32F-35F were submitted to the Appeals Council.  (AT 5, 37-39.)  There is no indication that the ALJ sought a supplemental opinion from Dr. Cox based on the later-submitted evidence.

14

1  proceedings" and "the record has been thoroughly developed." Varney v. Sec'y of Health &
2  Human Servs., 859 F.2d 1396, 1399 (9th Cir. 1988). This is a recognition of the "need to
3  expedite disability claims." Id. at 1401.
4         Generally, where the ALJ fails to provide adequate reasons for rejecting the
5  opinion of a treating physician, the opinion is credited as a matter of law. Lester, 81 F.3d at 834.
6  However, in this case Dr. Williams's opinion, while not entirely unsupported, is somewhat
7  conclusory and the medical evidence in the period after plaintiff's hip replacement surgery is
8  ambiguous as to plaintiff's level of pain and functional limitations. Consequently, the court
9  cannot credit Dr. Williams's opinion as a matter of law. Instead, the court finds that remand is
10 necessary for a medical consultation by a consultative orthopaedist who is provided full access to
11 plaintiff's prior medical records. The ALJ should also seek any necessary clarification from Dr.
12 Williams regarding his assessment of plaintiff so that Dr. Williams' opinion can be properly
13 evaluated.
14         Plaintiff further contends that the Appeals Council improperly rejected the
15 opinion of her treating orthopaedic surgeon, Dr. Ure. On March 7, 2009, a few months after
16 plaintiff's November 19, 2008 hip replacement surgery, Dr. Ure completed a form indicating that
17 plaintiff was temporarily disabled and was unable to perform work in any occupation from
18 January 27, 2008, until August 15, 2009, when she could likely return to work. (AT 470.) Dr.
19 Ure provided more specific functional capacity limitations in an earlier October 2, 2008 report,
20 which also indicated that plaintiff was unable to work and predated plaintiff's hip replacement
21 surgery. (AT 471-73.)   Although these reports were not before the ALJ and only later submitted
22 to the Appeals Council, any additional evidence considered by the Appeals Council in denying
23 the request for review becomes part of the administrative record for review by this court. See
24 Ramirez v. Shalala, 8 F.3d 1449, 1452 (9th Cir. 1993); see also Harman v. Apfel, 211 F.3d 1172,
25 1179-80 (9th Cir. 2000) (the court may properly consider the additional materials because the
26 Appeals Council addressed them in the context of denying appellant's request for review).

15

Even if the ALJ ultimately determines that plaintiff is not currently disabled under the Act, Dr. Ure's opinion that plaintiff was unable to work between January 27, 2008, and August 15, 2009, if credited, would establish that plaintiff is eligible for a discrete period of benefits.[9] The court is unable, based on the record before it, to determine the basis for Dr. Ure's opinion that plaintiff was unable to work as early as January 27, 2008, especially given that plaintiff was not yet under Dr. Ure's care at that time. However, there appears to be some support for that opinion given that another orthopaedic surgeon, Dr. Righetti, opined on February 26, 2008, that plaintiff was unable to work even a sedentary job and needed a hip replacement. (AT 314.) To be sure, the ALJ properly discredited Dr. Righetti's opinion as irrelevant to plaintiff's RFC at the time of the ALJ's decision, which was more than a year after the hip replacement surgery. Nevertheless, the ALJ never considered Dr. Righetti's opinion, and never had an opportunity to consider Dr. Ure's October 2, 2008 and March 7, 2009 opinions, regarding whether plaintiff may have been disabled from some point in time prior to her surgery through the end of her recovery from surgery. Accordingly, on remand, the ALJ will also be required to properly evaluate the opinions of Dr. Ure and Dr. Righetti to determine whether plaintiff may be eligible for a period of benefits based on their assessments. If necessary, the ALJ should seek clarification from those physicians regarding the bases for their opinions.

In sum, because the Commissioner failed to provide specific and legitimate reasons for rejecting the opinions of plaintiff's treating physicians, the case will be remanded for proper consideration of those opinions in accordance with this order and a consultative examination by an orthopaedist who is provided full access to plaintiff's prior medical records. Depending on the ALJ's findings and conclusions, the ALJ may also want to conduct a supplemental hearing with vocational expert testimony regarding any limitations found.

---

[9] The Act requires an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

      2.    Other Issues

Finally, in light of the court's conclusion that the case should be remanded for further consideration of the medical opinions and an additional medical consultation, the court will not address plaintiff's remaining issues regarding the ALJ's RFC assessment, hypothetical questions, and credibility determinations. On remand, the ALJ will have an opportunity to consider whether revision of his analysis concerning these issues would be appropriate in light of any new evidence or findings.

V.    CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (dkt. nos. 14, 17) is granted in part.

2. The Commissioner's cross-motion for summary judgment (dkt. no. 20) is denied.

3. This matter is remanded for further proceedings consistent with this order pursuant to sentence four of 42 U.S.C. § 405(g).

4. Judgment is entered for plaintiff.

IT IS SO ORDERED.

DATED: March 28, 2012

                                                  KENDALL J. NEWMAN
                                                UNITED STATES MAGISTRATE JUDGE

Tuter.1474.ss.wpd